## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | 8:05CR62 |
| vs. | ) | |
| | ) | **REPORT AND** |
| **WESLEY PAPPAS,** | ) | **RECOMMENDATION** |
| | ) | |
| **Defendant.** | ) | |

This case is before the court on the defendant's Motion to Suppress [16]. Hearing on the motion was held on April 13, 2005 and the court took the motion under advisement. The transcript of the hearing [26] was filed on April 20, 2005 and the matter was deemed submitted.

The defendant, Wesley Pappas, moves the court for the suppression of all evidence obtained as a result of a traffic stop in Omaha, Nebraska on January 3, 2005. The defendant contends the stop was not based upon reasonable suspicion or probable cause and, therefore, violated his rights under the Fourth Amendment to the United States Constitution. The government challenges the defendant's standing to object. In the alternative, if the defendant does have standing, a traffic violation supplied probable cause for the stop, and officer safety and search incident to arrest provided authority for the search. The government also claims the vehicle search was proper as part of an inventory taken as the vehicle was prepared for towing.

### FACTUAL BACKGROUND

Adele Tomsu testified she is employed as a patrol officer with the City of Omaha and that prior to her nine years of service with the Omaha police department, she served seven years as a uniformed police officer in El Cajon, California. On January 3, 2005 at approximately 10:00 a.m.,

while operating a marked cruiser southbound on 16th Street near Locust (5:17-20), she observed a running vehicle, a pickup truck, parked in front of an appliance store (5:23-6:3). The vehicle drew her attention because on November 15, 2004 she had stopped the same vehicle while it was operated by the defendant, Wesley Pappas. During that stop the defendant identified himself with a release form from the Florida State Penitentiary, which caused Tomsu to believe he was a convicted felon (6:4-7:20). During the November 15th stop, while arresting the defendant for driving under suspension, she was injured and off work for about six weeks (7:24-8:6).

Tomsu testified that on January 3, 2005 when she observed the vehicle, it was parked and appeared to be running (9:21-23). She parked in the next block and watched and waited for fifteen to twenty minutes (10:3-11), during which time she ran the defendant on her car computer. The check showed the defendant's license was suspended in Colorado (10:12-19). She then called Officer Nordby and requested that he provide her backup (10:20-25). Nordby arrived in uniform driving a marked cruiser and took a position to the north of the suspect vehicle, allowing Tomsu to watch the vehicle from the south and Nordby to watch from the north (11:14-24). Tomsu advised Nordby that she believed the driver was under suspension and was a convicted felon (12:5-13).

Tomsu testified that she observed the defendant back the vehicle onto the sidewalk and into a parking lot, where she lost sight of the vehicle (12:20-13:3). She then saw the vehicle in an alleyway traveling towards Binney Street (13:4-11). She left her location and traveled west on Locust before turning North on 16th where she observed the vehicle pull onto Binney (14:2-6) and stop in the alleyway, partially on the street and partially obstructing the sidewalk (14:12-19). As she parked her cruiser on the north curb of Binney (14:23-15:6), she observed Nordby park along the south curb. Neither of the police cruisers blocked the suspect vehicle (15:7-15).

Tomsu testified she walked to the driver's side of the vehicle and told the driver to get out of the car (15:22-16:1). The defendant exited the vehicle and was handcuffed (16:9-13). Officer Nordby then conducted a pat-down search which revealed a live .38 caliber handgun round in the defendant's front pant pocket (16:14-24). Nordby asked if he had a gun and the defendant responded "no," he had found the round on the street (17:2-5).

Tomsu also testified that she had received information a few days before the stop from an "untested informant" during an interview, that the defendant had a firearm (17:6-14). With that knowledge and having located a round in the defendant's pocket, she took the defendant downtown. It was her intention that the vehicle be towed per the Omaha police department's towing policy (Ex. 1) (18:11-19:1). On cross-examination Tomsu testified that by "untested informant" she meant that before someone can be credible they have to be found reliable, by giving accurate information and this informant had not previously provided information (19:25-20:24).

Tomsu admitted that during the November 2004 arrest of the defendant, she had injured her knee as the defendant attempted to get away while she attempted to pat him down and that she had been back to work a week or less before again arresting the defendant (21:3-22:2). Tomsu also admitted that prior to being asked about the bullet, the defendant had not received *Miranda* warnings, that he was in custody, and was subjected to questions by law enforcement (23:4-21).[1]

On cross-examination Tomsu stated that during her November 15, 2004 contact with the defendant, she was told by the defendant that he was purchasing or had purchased the vehicle (24:22-25:2) and that the vehicle was the same vehicle she observed on January 3, 2005 (25:3-9). Tomsu admitted she was aware that on November 25, 2004 the defendant had been stopped in the

---

[1]Defendant has not raised any *Miranda* issues in conjunction with this motion.

vehicle, and had produced a title for the vehicle (25:6-12); that on November 29, 2004 he was stopped for a traffic violation and again produced a title (25:13-18); and that on December 16, 2004 the defendant was involved in a traffic stop and had indicated that he had bought the vehicle (25:22-25).

Tomsu admitted that following the January 3, 2005 incident, the vehicle was not impounded because prior to the tow truck taking the vehicle, the defendant had gotten in contact with his mother and the vehicle was released to her (26:3-19).

Tomsu, on cross-examination, denied that she went to the area of the appliance store with the idea the defendant would be present; rather, she stated she was just patrolling (27:6-11). She did admit that when she saw the vehicle she waited to see if the defendant would drive or commit a crime (27:18-24), and that when she saw him she knew it was the defendant (28:6-8). She stated she did not recall telling dispatch that if the driver of the vehicle "is who I think it is, he's suspended." (28:10-24; 43:20-24). She admitted that her written report states that the defendant was suspended and does not state that she confirmed the suspension on January 5, 2005 (30:15-25). She further testified that as she watched the vehicle, prior to it driving through the parking lot, she believed that the defendant was the driver (42:2-10). After the defense played track two of Exhibit #105, Tomsu stated that on the track she is saying, "It's a truck and he's suspended. That's the truck and he's suspended." (42:11-43:24).

On direct examination Eric D. Nordby testified that he is a 3½ year veteran of the Omaha Police Department, having previously served eight years with the Fremont Police Department (49:9-25). On January 3, 2005 he received a cell phone call from Tomsu, indicating that she had observed the defendant sitting in the driver's seat of a running vehicle on 16th near Locust

-4-

(50:12-14). Tomsu also advised him the defendant was a suspended driver, a felon, and that she had information he had a pistol (50:18-51:1).

Nordby testified that he joined Tomsu in the area of 16th and Locust and briefly visited with her before taking a position at 18th and Binney (51:11-24). After about twenty minutes he observed the vehicle back up onto 16th Street and pull into a parking lot where he lost sight of the vehicle (52:5-12). By radio he was informed by Tomsu that the vehicle was still moving, so he moved his patrol car to observe the alley in case the parking lot extended to the alley. He observed the vehicle northbound in the alley between 18th and 16th Streets, (52:13-23) and saw it stop on the sidewalk short of Binney Street (52:24-53:10). Both he and Tomsu exited their cruisers and Nordby observed Tomsu contact the defendant, but could not hear what was said (54:15-25). He observed the defendant exit his vehicle and Tomsu handcuff him (55:1-2). Nordby then patted down the defendant and located a .380 caliber bullet in the defendant's right front pant pocket. He asked the defendant if he had a gun. The defendant responded that he did not, that he had found the bullet on the ground (55:3-56:6).

Nordby testified that he searched the vehicle because the defendant was under arrest and for inventory prior to impoundment (56:7-12). Starting on the passenger side, he searched the tool box, the bed of the vehicle, the driver side passenger compartment, and the engine compartment, noting that when drugs or firearms are found or if he believes there might be firearms, his normal search includes the engine compartment (56:15-24). After lifting the hood, he located a firearm stuck in a recess by the radiator on the driver's side behind a headlight (58:2-7). The weapon was a loaded high point model CF30 .38 caliber semi-automatic pistol with a round in the chamber. All but one of the rounds in the magazine matched the round from the defendant's pocket (58:20-59:5).

Nordby testified that during his search of the vehicle, he also located methamphetamine in a pouch-type cover or container on the driver's side visor (59:6-12). He admitted the vehicle was never towed, noting that shortly before the tow truck arrived, an adult female showed up, identified herself as the defendant's mother, and told the officers the defendant had called her and asked her to come and get the vehicle. The vehicle was released to the woman per department policy (59:16-24).

On cross-examination Nordby admitted that the gun was not a .38 caliber, but a .380 (60:15-16). Nordby denied that he was ever informed by Tomsu that she was looking for the defendant (61:4-6). He stated he first became aware the defendant was allegedly in possession of a pistol, when Tomsu called him at 10:00 A.M., and requested assistance in the area of 16th and Locust (61:10-19). Nordby also noted Tomsu told him that she had performed a records check on the defendant that day. Nordby believed he received the records check information when he first made contact with Tomsu after he arrived at 15th and Locust (64:12-21).

On cross-examination Nordby stated that Tomsu did not tell him when she checked the defendant's record (64:12-23). He also admitted that he was aware of Tomsu's previous contact with the defendant, but was not aware her November 2004 injury occurred during contact with the defendant (64:24-65:15).

## LEGAL ANALYSIS

The government first contends the defendant lacks standing to challenge the stop of his vehicle. That argument was not satisfactorily discussed in the government's brief, and the court cannot discern any factual basis for the argument. Since the defendant claims ownership of the vehicle and was actually driving the vehicle when it was stopped, it seems fairly obvious that the

-6-

defendant has the "legitimate expectation of privacy" necessary to challenge the stop and search of his vehicle.

Turning to the merits, defendant contends the vehicle he was driving was stopped without reasonable suspicion or probable cause to believe he had committed any crime and, therefore, was stopped in violation of his Fourth Amendment rights.

### A. Reasonable Suspicion; Probable Cause

"For purposes of constitutional analysis, a traffic stop is characterized as an investigative detention, rather than a custodial arrest." *United States v. Jones*, 269 F.3d 919, 924 (8th Cir. 2001) (citing *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984)); *United States v. Wheat*, 278 F.3d 722, 726 (8th Cir. 2001), cert. denied, 537 U.S. 850 (2002). As such, a traffic stop is governed by the principles of *Terry v. Ohio*, 392 U.S. 1 (1968). *Jones*, 269 F.3d at 924. Under *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968), a police officer may conduct an investigative stop if the officer has a reasonable suspicion that the person stopped is, or is about to be, engaged in criminal activity. *See also Delaware v. Prouse*, 440 U.S. 648, 663 (1979). Reasonable suspicion requires a particularized and objective basis for suspecting the person stopped of criminal activity, but the level of suspicion required for a *Terry* stop is less demanding than that for probable cause. *United States v. Gonzalez*, 220 F.3d 922, 925 (8th Cir. 2000) (internal quotations and citations omitted). "A reasonable suspicion may be justified even if there are innocent explanations for a defendant's behavior when the circumstances are considered in the totality." *United States v. Tuley*, 161 F.3d 513, 515 (8th Cir. 1999). Significantly, even "[a] mistaken premise can furnish grounds for a *Terry* stop, if the officers do not know that it is mistaken and are reasonable in acting upon it." *United States v. Ornelas-Ledesma*, 16 F.3d 714, 718 (8th Cir. 1994), *judgment vacated on other grounds*, 517 U.S. 690 (1996)

(citing *Illinois v. Rodriguez*, 497 U.S. 177, 184-86 (1990)); *United States v. DeLeon-Reyna*, 930 F.2d 396, 399 (5th Cir. 1991) (en banc) (per curiam); and *United States v. Walraven*, 892 F.2d 972, 974-75 (10th Cir. 1989)).

In this case, Officer Tomsu had cited the defendant for driving with a suspended license just six weeks before the January 3, 2005 stop. That particular stop was memorable because Tomsu was injured when the defendant tried to escape. Tomsu testified, credibly, that on January 3, she observed the defendant's vehicle for fifteen to twenty minutes, during which she ran a computer check which showed defendant's license was still suspended. She and Officer Nordby then observed defendant driving the vehicle, providing probable cause to stop the defendant for committing a traffic offense.

Under *Whren v. United States*, 517 U.S. 806, 810 (1996), "the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." "An officer's observation of a traffic violation, however minor, gives the officer probable cause to stop a vehicle, even if the officer would have ignored the violation but for a suspicion that greater crimes are afoot." *United States v. Enriquez Luna*, 368 F.3d 876, 878 (8th Cir. 2004); *accord United States v. Barragan*, 379 F.3d 524, 528 (8th Cir. 2004). A valid traffic stop may not be challenged on the ground that it was a pretext for other investigation. *United States v. $404,905.00 in United States Currency*, 182 F.3d 643, 646 (8th Cir. 1999), *cert. denied*, 528 U.S. 1161 (2000).

Considering these authorities in conjunction with the facts of this case, I find that the officers had both reasonable suspicion and probable cause to stop the defendant for driving without a valid license.

### B.  Search, Detention and Arrest of the Defendant

Having made a valid traffic stop, the officers were allowed to detain the defendant while they completed "a number of routine but somewhat time-consuming tasks related to the traffic violation, such as computerized checks of the vehicle's registration and the driver's license and criminal history, and the writing up of a citation or warning." *United States v. $404,905.00 in United States Currency*, 182 F.3d at 647 (citing *United States v. Carrazco*, 91 F.3d 65, 66 (8th Cir. 1996)). "During this process, the officer may ask the motorist routine questions such as his destination, the purpose of the trip, or whether the officer may search the vehicle, and he may act on whatever information is volunteered." *Id.* Pursuant to *Terry*, officers may check a person for weapons and may take any additional steps that are reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop. *See United States v. Watts*, 7 F.3d 122, 125 (8th Cir. 1993), *cert. denied*, 510 U.S. 1078 (1994).

Driving with a suspended license is a Class III misdemeanor under Neb. Rev. Stat. § 60-4,108(2) (2001). Nebraska law also permits a warrantless arrest when the officer has probable cause to believe that a person has committed a misdemeanor in his presence. Neb. Rev. Stat. § 29-404.02(2)(d) (Reissue 1995). While conducting a *Terry* search of the defendant's person, the officers found a live round of ammunition. They had previously received information that defendant carried a gun, and the defendant had tried to escape when he was stopped in November 2004. Considering the totality of the circumstances, I find that placing the defendant in handcuffs was a reasonable precaution. *See United States v. Navarrete-Barron*, 192 F.3d 786, 791 (8th Cir. 1999) (Using handcuffs can be a reasonable precaution during a *Terry* stop), and the defendant was lawfully arrested.

### C. Search of the Vehicle

#### 1. Automobile Exception

Officer Nordby testified that he searched the vehicle because the defendant was under arrest and for inventory prior to impoundment (56:7-12). The "automobile exception" to the warrant requirement authorizes officers to search a vehicle without a warrant if they have probable cause to believe the vehicle contains evidence of criminal activity. *United States v. Hill*, 386 F.3d 855, 858 (8th Cir. 2004). "'If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth amendment ... permits police to search the vehicle without more.'" *Maryland v. Dyson*, 527 U.S. 465, 467 (1999) (quoting *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996)).

In this case, the officers had information from an uncorroborated informant that defendant carried a weapon. They found a round of ammunition on the defendant's person. Although the officers had probable cause to believe defendant had committed a traffic offense, I find that the government has not established that there was probable cause to believe the vehicle itself contained evidence of criminal activity. I find that the automobile exception does not apply in this case.

#### 2. Impoundment

Since the defendant could not lawfully drive his vehicle away from the scene, the officers took steps to impound the vehicle in accordance with the Omaha Police Department's towing policy (Ex. 1). In this context, the search of the defendants' vehicle appears to be permissible under *United States v. Wallace*, 102 F.3d 346, 348 (8th Cir. 1996):

> It is well established that "[t]he police are not precluded from conducting inventory searches when they lawfully impound the vehicle of an individual that they also happen to suspect is involved in illegal activity." *United States v. Marshall*, 986 F.2d 1171, 1175-76 (8th Cir. 1993). In other words, "[a]s long as impoundment pursuant to the community caretaking [or public safety] function is not a mere

subterfuge for investigation, the coexistence of investigatory and caretaking [or public safety] motives will not invalidate the search." *Id*. at 1176 (quoting *United States v. Rodriguez- Morales,* 929 F.2d 780, 787 (1st Cir. 1991), *cert. denied*, 502 U.S. 1030 (1992)). In *Colorado v. Bertine*, 479 U.S. 367, 374 (1987), the Supreme Court held that "reasonable police regulations relating to inventory procedures administered in good faith satisfy the Fourth Amendment."

(Parallel citations omitted). Later, in *United States v. Mayfield*, 161 F.3d 1143, 1145 (8th Cir. 1998),

the Eighth Circuit stated:

After lawfully taking custody of an automobile, police may search the automobile without a warrant to produce an inventory of the automobile's contents. *See South Dakota v. Opperman*, 428 U.S. 364, 376 (1976). The intrusion is justified by governmental interests in protecting the owner's property while it remains in police custody, in protecting the police against claims or disputes over lost or stolen property, and in protecting the police from potential danger. *See id*. at 369. The Fourth Amendment is not offended if, considering the totality of the circumstances, the inventory search is reasonable. *See id*. at 373. Inventory searches are reasonable when they are conducted according to standardized police procedures. *See id*. at 372; *see also Colorado v. Bertine*, 479 U.S. 367, 374 (1987). Compliance with procedures merely tends to ensure the intrusion is limited to carrying out the government's caretaking function. *See Opperman*, 428 U.S. at 374-75. This does not mean that inventory searches are always unreasonable when standard procedures are not followed, however. *See United States v. Woolbright*, 831 F.2d 1390, 1394 (8th Cir. 1987) (failure of police to complete inventory of arrestee's belongings as policy provided after finding drugs in arrestee's suitcase did not render inventory search unreasonable where police changed plans and decided to transfer arrestee to federal authorities); *United States v. Trullo,* 790 F.2d 205, 206 (1st Cir. 1986); *see also Whren v. United States*, 517 U.S. 806, 816 (1996) (although adherence to procedures shows lack of pretext, deviation from procedures does not prove pretext).

(Parallel citations omitted).

Finally, the Court in *South Dakota v. Opperman* long ago acknowledged that

[t]he authority of police to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience is beyond challenge.

When vehicles are impounded, local police departments generally follow a routine practice of securing and inventorying the automobiles' contents. These procedures developed in response to three distinct needs: the protection of the owner's property while it remains in police custody, ... the protection of the police

-11-

> against claims or disputes over lost or stolen property, ... and the protection of the police from potential danger....

428 U.S. at 369 (citations omitted). The Court also observed that it "has consistently sustained police intrusions into automobiles impounded or otherwise in lawful police custody where the process is aimed at securing or protecting the car and its contents." *Id.* at 373.

I find credible the officers' testimony that the vehicle was searched at the scene because they intended to impound it. The department's impound policy requires an inventory search prior to the time a vehicle is turned over to the tow truck driver. Although the officers were entitled to impound the vehicle, their ultimately releasing it to the defendant's mother was not inconsistent with the department's towing policy. Examining the "totality of the circumstances" surrounding the initial decision to impound and conduct an inventory search of defendant's vehicle, *see United States v. Mayfield*, I conclude this search was reasonable under the Fourth Amendment.

## RECOMMENDATION

In summary, there was probable cause to stop defendant for driving without a valid license. Since he could not lawfully drive his truck away from the area, the officers intended to impound the vehicle. The vehicle was lawfully searched in accordance with department policy in preparation for towing.

For these reasons,

**IT IS RECOMMENDED** that defendant's Motion to Suppress [16] be denied.

Pursuant to NECrimR 57.3, a party may object to this Report and Recommendation by filing a "Statement of Objection to Magistrate Judge's Recommendation" within ten (10) days after being served with the recommendation. The statement of objection shall specify those portions of the recommendation to which the party objects and the basis of the objection. The objecting party shall file contemporaneously with the statement of objection a brief setting forth the party's arguments

that the magistrate judge's recommendation should be reviewed *de novo* and a different disposition made.

**DATED May 13, 2005.**

            **BY THE COURT:**

            **s/ F.A. Gossett**
            **United States Magistrate Judge**